[Cite as *In re Miami Conservancy Dist.*, 2025-Ohio-116.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN THE MATTER OF: THE MIAMI
CONSERVANCY DISTRICT

:
:
:      C.A. No. 30193
:
:      Trial Court Case No. 36847
:
:      (Civil Appeal from Common Pleas
:      Court)
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on January 17, 2025

. . . . . . . . . . .

JASON P. CONTE & EMILY H. DAVIS, Attorneys for Appellant

GREGORY J. DEGULIS & LEE A. SLONE, Attorneys for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Sunesis Construction Company appeals from the trial court's judgment overruling Sunesis's motion for partial summary judgment and granting summary judgment to the Miami Conservancy District (MCD) on Sunesis's claims and on MCD's counterclaim. For the following reasons, the trial court's judgment will be affirmed in part,

reversed in part, and remanded for further proceedings regarding Payment Items 11, 20, and 26.

## I. Facts and Procedural History

{¶ 2} The following facts are undisputed. The MCD, established after the 1913 flood, is a public organization responsible for flood protection in the Great Miami River watershed. Between 1918 and 1922, MCD constructed five dry dams along major waterways – the Lockington, Germantown, Englewood, Taylorsville, and Huffman Dams.

{¶ 3} Given the technology at the time, the concrete used in the dams' construction was highly susceptible to deterioration from freezing and thawing in the presence of moisture. Over time, it has suffered deterioration in the form of cracking,


Fig. 5 – Lockington Dam After Construction

spalling, and delamination. Some surface repairs were performed in the 1970s using shotcrete, but those repairs have delaminated as well and the original concrete has continued to deteriorate. *See* O'Connor Dep., Ex. 10. Due to the dams' aging infrastructure, MCD had a pilot concrete repair project performed on the southwest abutment wall (downstream right side, when looking downstream) of the Lockington Dam in 2017, with a report issued in February 2018. *Id.*

{¶ 4} In 2019, MCD sought bids for the Lockington Dam Right Wall Drain System and Concrete Repair Project ("the Project"), Contract No. 2019-021C, which primarily focused on repairing the right spillway walls. On October 11, 2019, MCD hired Sunesis for the Project; the original agreed cost was $2,614,347. MCD Motion for Summary

Judgment (MSJ), Ex. K. MCD subsequently agreed to pay an additional $62,896.84 in two change orders. MCD MSJ, Ex. L.

{¶ 5} The Contract consisted of several complementary documents. General Condition 35 set forth an order of precedence for the contract documents: (1) Contract, (2) Change Orders, (3) Addenda, (4) Detailed Specifications, (5) Plans/Drawings, (6) General Conditions, (7) Proposal, (8) Instructions to Bidders, (9) Other documents specifically referenced in the Contract, and (10) ODOT Specifications. In the event of a conflict between the documents, the interpretation of MCD's Engineer governed. GC-35.

{¶ 6} Sunesis's tasks were delineated in 35 Payment Items, which were part of the Detailed Specifications. For each Payment Item, the Contract provided a general description of the work to be performed, a description of any required submittals, any material requirements, any required methods and processes, and instructions on measurement and payment. Final payment for the contract was based on "actual quantities realized and unit prices of payment items." GC-17 (Final Payment); O'Connor Dep. 46.

{¶ 7} The Contract also contained 36 General Conditions. Of particular relevance here, GC-8 provided:

**GC-8. Direction of Work and Interpretation of Plans and Specifications**

It is mutually agreed that the ENGINEER shall have the right to direct the manner in which all work under this Contract is to be conducted, insofar as may be necessary to secure the safe and proper progress and quality of the

work. *Upon all questions concerning the execution of the work, interpretation of the Specifications and Plans, determination of all quantities and amounts of work done, the decision of the ENGINEER shall be final and binding on both parties*, and compliance with its estimates and decisions shall be a condition precedent to the right of the CONTRACTOR to receive any payment under the Contract.

(Emphasis added.) The term "Engineer" was defined as MCD's Chief Engineer or properly authorized agents. GC-1 (Definitions). It included the terms "owner's representative," "project manager," and "consultant." Throughout the contract, Donald O'Connor served as project manager for MCD.

{¶ 8} Sunesis agreed to begin work within 10 days after the date of the Notice of Commencement and to complete the Project within 180 days, unless extended by a written change order. The initial project completion date was April 11, 2020.

{¶ 9} A week after contracting with Sunesis, MCD hired DLZ, its design engineer consultant, to provide construction administration, concrete and materials testing, and as needed construction-phase engineering services. MCD MSJ, Ex. B. O'Connor testified that he and DLZ were the "Engineer" for the Project. O'Connor Dep. 45. For the majority of the time, Kyle Sparks of DLZ served as an observer engineer, documenting what happened each day, taking measurements, and performing testing. MCD's contract with DLZ expired prior to the completion of the project. At that point, Jim Kittel of MCD assumed Sparks's role. O'Connor Dep. 26.

{¶ 10} By a written change order in June 2020, the Project deadline was extended

to July 30, 2020. Sunesis substantially completed its work in the spring of 2021.

{¶ 11} On November 12, 2021, Sunesis filed suit against MCD, raising claims of breach of contract, unjust enrichment, and promissory estoppel. Sunesis alleged that it had fulfilled all conditions and obligations under the Contract and that MCD had breached the agreement by failing to pay Sunesis for work performed under Payment Items 11 (concrete apron), 20 (concrete), 26 (concrete revetment), and 31 (patching concrete structure). The company further alleged that it had performed additional concrete work for which MCD had been unjustly enriched.

{¶ 12} In its answer, MCD asserted that Sunesis had been paid in full for the work it performed and denied that Sunesis was entitled to any additional compensation. MCD also asserted a counterclaim for expenses incurred due to Sunesis's failure to complete the Project on time.

{¶ 13} In December 2021, the parties agreed to Change Order #2, which modified some aspects of the Project and increased the contract amount, but did not expressly extend the July 30, 2020 completion deadline. The parties also signed an "Agreement on Change Order #2" in which they agreed that the change order and the payment made by MCD to Sunesis "shall not affect or impact, nor shall these actions act as a waiver of the claims or defenses of Sunesis or MCD in the litigation." O'Connor Dep., Ex. 12.

{¶ 14} After extensive discovery, Sunesis filed a motion for partial summary judgment on Payment Item 31. MCD countered with its own motion for summary judgment on all of Sunesis's claims, as well as a motion for summary judgment on its counterclaim.

{¶ 15} On June 4, 2024, the trial court granted MCD's motions and denied Sunesis's motion. The trial court found that the language of the contract was clear and unambiguous as to the requirements and the manner of determining compensation: compensation was to be determined by field measurements and the approval of the MCD Engineer. The court further found that the contract provided that any disputes were to be resolved by the MCD Engineer, whose decision was final and binding. The court concluded that, because the Engineer did not approve the after-payment measurements submitted by Sunesis, Sunesis was paid in conformity with the terms and conditions of the contract. The trial court further found no dispute that Sunesis had failed to timely complete the Project, causing MCD to incur additional costs of $110,319.82, plus an additional amount not to exceed $3,590 for the expense of obtaining as-built drawings.

{¶ 16} Sunesis appeals from the trial court's judgment, claiming that the trial court erred in granting summary judgment to MCD and denying Sunesis's motion for partial summary judgment.

## II. Summary Judgment Standard

{¶ 17} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115 (1988). To this end, the

movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996).

{¶ 18} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Dresher* at 293. Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 19} We review the trial court's ruling on a motion for summary judgment de novo. *Martcheva v. Dayton Bd. of Edn.*, 2021-Ohio-3524, ¶ 35 (2d Dist.). De novo review means that this court uses the same standard that the trial court should have used, and we examine all the Civ.R. 56 evidence, without deference to the trial court, to determine whether, as a matter of law, no genuine issues exist for trial. *Ward v. Bond*, 2015-Ohio-4297, ¶ 8 (2d Dist.).

### III. Relevant Legal Authority

{¶ 20} To prove a breach of contract claim, a party must establish (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damage or loss to the plaintiff. *Lexis Nexis, a Div. of Relx Inc. v. Murrell*, 2022-Ohio-550, ¶ 21 (2d Dist.). In this case, it is undisputed that MCD hired Sunesis for the Project and that Sunesis completed performance of Payment Items 11, 20, 26, and 31. *See* O'Connor Dep. 46-48 (acknowledging that MCD accepted Sunesis's work on Payment Items 11,

20, 26, and 31). Sunesis asserts that MCD failed to pay in full for the work it performed.

{¶ 21} When reviewing a contract, the court's primary role is to ascertain and give effect to the intent of the parties. *Tera, L.L.C. v. Rice Drilling D, L.L.C.*, 2024-Ohio-1945, ¶ 11; *Hamilton Ins. Serv., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273 (1999). We presume that the intent of the parties is reflected in the contract's language. *Tera* at ¶ 11; *DiPasquale v. Costas*, 2010-Ohio-832, ¶ 36 (2d Dist.). Courts will give terms their plain and ordinary meaning unless another meaning is clearly apparent from the contents of the agreement. *Sunoco, Inc. (R&M) v. Toledo Edison Co.*, 2011-Ohio-2720, ¶ 37. Technical terms will be given their technical meaning unless a different intention is clearly expressed. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997).

{¶ 22} A contract that is, by its terms, clear and unambiguous requires no real interpretation or construction and will be given the effect called for by the plain language of the contract. *Aultman Hosp. Assn. v. Community Mut. Ins. Co.*, 46 Ohio St.3d 51, 55 (1989). On the other hand, "[a] contract is ambiguous where its meaning cannot be ascertained from its terms or where it is susceptible to multiple reasonable interpretations." *McGinnis v. Conley*, 2024-Ohio-482, ¶ 13 (2d Dist.). Whether a contract is ambiguous is a question of law. *Tera* at ¶ 12.

{¶ 23} A plain and unambiguous contract does not become ambiguous simply because its operation will work a hardship upon one of the parties and a corresponding advantage to the other. *Dugan & Meyers Constr. Co., Inc.,* 2007-Ohio-1687, ¶ 29*; Fifth Third Bank W. Ohio v. Carroll Bldg. Co.*, 2009-Ohio-57, ¶ 14 (2d Dist.). It is not the

province of courts to relieve parties of improvident contracts. *Id*. "[U]nless there is fraud or other unlawfulness involved, courts are powerless to save a competent person from the effects of his own voluntary agreement." *Id*., citing *Ullmann v. May*, 147 Ohio St. 468, 476 (1947). These principles apply in cases involving a competitively bid public construction contract. *Dugan & Meyers* at ¶ 30.

{¶ 24} Where the question before the court on summary judgment concerns contract interpretation, "summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity." *Bigham v. Deer Run Owners Assn.*, 2024-Ohio-5233, ¶ 16 (2d Dist.), quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992). But, where language is susceptible to differing but reasonable interpretations, the meaning of the words become an issue of fact and summary judgment is not appropriate. *Id*.; *Wittstein v. Wittstein*, 2006-Ohio-6707, ¶ 8 (12th Dist.). "Resolving the meaning of ambiguous terms in a contract is a matter of factual determination for the fact-finder." *Tera* at ¶ 19; *Bigham* at ¶ 16.

### IV. Sunesis's Claims

{¶ 25} Sunesis's first and second assignments of error assert that the trial court erred in granting summary judgment to MCD on Sunesis's breach of contract claim for additional payment for Payment Items 11, 20, 26, and 31.

### A. Payment Item 31

{¶ 26} In its first assignment of error, Sunesis claims that the trial court erred in granting summary judgment to MCD and denying Sunesis's motion for partial summary judgment on Payment Item 31 (concrete patching) for three reasons. First, it claims that

the trial court erred in concluding that Sunesis failed to provide MCD with written field measurements to support payment for concrete patching. Second, it argues that the trial court erred in giving MCD's Engineer "unbridled discretion" to resolve disputes regarding whether Sunesis properly documented its work with field measurements. Third, Sunesis asserts that the trial court improperly accepted MCD's measurements to conclude that Sunesis was not entitled to additional payment.

{¶ 27} Payment Item 31 concerned the demolition and patching of deteriorated concrete on the upstream and downstream right spillway walls, which consisted of rows of concrete blocks called monoliths. *See* Rayburn Aff, ¶ 4. It is undisputed that before



the Project began, there was only one exposed face on the monoliths to be patched, the channel or flow face. *See* Doyle Dep. 63 & Ex. 79 (highlighting Monolith 4A on the upstream wall). Per the Contract Plans, prior to patching, Sunesis removed the stair-stepped uppermost level of the monoliths, exposing the horizontal side and a vertical side of the monoliths to be repaired.

{¶ 28} Subpart 31.1 specified that the work included "removing all loose and disintegrated existing concrete to sound concrete; preparing the surface; erecting and removing concrete forms; supplying, placing, and finishing concrete; supplying and

placing welded steel wire fabric, reinforcing steel and dowels; constructing the hydrodemolition test section; and supplying and placing the bonding agent as shown on the Plans and in accordance with ODOT 519."

{¶ 29} Subpart 31.4 described the methods and processes for completing the concrete patching. It explained that "[e]xisting concrete below the horizontal removal limits or outside of the vertical removal limits, as specified on the Plans, is to be examined for deteriorated concrete. Remaining concrete at these removal limits is to be sounded with a hammer to reveal any hollow sounding areas that may be indicative of the onset of concrete delamination. Any additional delaminated, loose, and deteriorated existing concrete at the removal limits is to be removed by hydrodemolition to reach sound concrete and to the approval of the ENGINEER before placement of any concrete repairs." Subpart 31.4. It further provided, in part:

During a pilot repair project for the concrete monoliths at the Lockington Dam, estimates of repair depths were made based on 3D scans of the concrete face after the removal of deteriorated concrete. The Lockington Dam Pilot Concrete Repair Project report from February 23, 2018 noted an average of 0.67 feet of deteriorated concrete removal from the monolith face for the second monolith from the top of the wall.

Once the limits of sound concrete have been determined, install vertical dowels as specified in Payment Item 19. Apply bonding agent to the final concrete surface after removal of deteriorated concrete. Patch concrete monoliths according to ODOT 519 and to match existing monolith

dimensions and horizontal and vertical construction joints.

**{¶ 30}** Payment for the concrete patching was to be made at the Contract unit price per square foot. Subpart 31.5. The agreed unit price was $197.25 per square foot. *See* Doyle Dep., Ex. D10; O'Connor Dep., Ex. 2. As for measurement of the patches, the Contract provided: "Measurement for Patching Concrete Structure shall be based on the number of square feet of concrete patched on the spillways walls *as measured in the field at locations shown on the Plans. The CONTRACTOR shall provide field measurements of the patched areas repaired and shall be verified by the ENGINEER prior to payment.*" (Emphasis added.) Subpart 31.5.

**{¶ 31}** The Contract included Plans which provided more details for completing the work. Sheet 6 of the Contract Plans included a side-view diagram of a typical concrete removal section with the monolith to be completely removed and replaced above and the monolith to be patched below it. Sunesis's Partial MSJ, Ex. 5 (DLZ Ex. 3). Sheet 11, entitled Concrete Sections and  Details, included a similar diagram with additional details and instructions. On both sheets, the cross-hatched section of the lower monolith depicted the areas of "removal of deteriorated concrete to sound concrete per Item 31 – Patching Concrete Structure."

**{¶ 32}** Sheet 5, entitled Excavation and Demolition Plan, includes the limits of hydrodemolition and concrete repair. Note 3 of the Sheet provides that the contract

should perform hydrodemolition "to the limits shown on Sheet 10 and as shown on Table 1 of this sheet." Table 1 provided the starting and end points, plus total feet, along the northwest (upstream) and southwest (downstream) walls.

{¶ 33} Sheet 10, below, showed the horizontal and vertical removal limits for entire concrete monolith removal and replacement, as well as the limits of concrete removal to sound concrete and patching for existing monoliths. The diagram also included the approximate volume of concrete to be removed in existing monoliths, and the lengths and elevations of the spillway wall. The engineer's estimate of the area of patching for Payment Item 31 was consistent with the area of the channel face to be patched, as shown on Sheet 10. Sheet 10 was later revised after it was found that the vertical construction joints on the as-built plans were not accurate, and the estimated square footage for Payment 31 was increased by the square footage of the additional channel face to be patched.



SUN-00010

{¶ 34} The parties disagree regarding what surfaces of the monolith were to be

measured in determining the square footage of the patch for Payment Item 31. Sunesis asserts that it should be paid for patching three faces of the monoliths – the channel, the side, and the horizontal top. MCD counters that the patch is measured only on the channel face.

{¶ 35} When Sunesis submitted its bid, it appears that both parties had the same understanding of Payment Item 31. William Saxton, senior estimator for Sunesis, reviewed the bid documents, visited the Lockington Dam, and prepared Sunesis's bid for the Project. He did not recall knowing about or seeing the pilot project report. Saxton Dep. 22-23. Saxton used HeavyBid, a software program, to determine the company's total estimated costs by inputting whatever variables were needed for that section of the job (what crew, how many people, what equipment, forming, etc.). As for Payment Item 31, he understood that 2,262 square feet was the estimated area to be patched at an average depth of eight inches. When asked during his deposition if that area would be the "flow face" or would include other potential areas that needed to be patched, Saxton responded, "I assumed it was the – I guess you're going to call it the flow face, the face of the dam." Saxton Dep. 31. He made that assumption because "it's in square feet." *Id.* at 32.

{¶ 36} Robert Doyle, Vice President of Operations at Sunesis, soon had a different view. Doyle attended a preconstruction meeting on October 9, 2019. At that time, he understood, based on the detail provided in the Plans, that the 2,262 square feet to be patched included the flow face and the top face. Doyle Dep. 97. Doyle had "no assumption on the vertical face, but the vertical face was directed in the field by Kyle

Sparks." *Id.* at 97-98.

**{¶ 37}** Jeremy Rayburn, Jr., one of Sunesis's foremen for the Project, was on site daily, overseeing Sunesis's work and working with Kyle Sparks, the field inspector from DLZ. Rayburn Aff., ¶ 3. According to Rayburn, Sparks would sound the concrete on the spillway walls to determine what concrete on the channel face, horizontal top face, and vertical side face was deteriorated and needed to be removed. Rayburn Aff., ¶ 5. Sounding is the process of striking the concrete surface and interpreting the sounds; solid concrete produces a ringing sound, while deteriorated concrete produces a flat or hollow sound. Rayburn Aff., ¶ 6.

**{¶ 38}** IVS, Sunesis's hydrodemolition subcontractor, performed the hydrodemolition on the spillway walls of the Lockington Dam, as directed by Sunesis. Clark Aff. ¶ 5. According to Rayburn, photographs of the work show that, after the surrounding monoliths were removed, hydrodemolition occurred on the channel face, horizonal top, and vertical side of the monolith. *See* Rayburn Aff. ¶ 9 & Ex. A; Doyle Dep. 63-67 & Ex. D79.

**{¶ 39}** IVS recorded contemporaneous field measurements of all areas where it performed hydrodemolition on the spillway walls. Clark Aff., ¶ 4. It submitted seven invoices to Sunesis for the work. Clark Aff., Ex. A. The first three invoices provided the total square footage of the hydrodemolition it performed on the respective dates. The fourth invoice provided a total square footage

with the notation "tops and sides." The last three invoices provided the areas of hydrodemolition for the front and top, as well as the sum of the two. IVS measured that it had completed 4,605.11 square feet of hydrodemolition on the Project. Clark Aff., ¶ 6 & Ex. A.

{¶ 40} According to Rayburn, once the hydrodemolition was completed, his team of Sunesis employees formed up and patched the areas of the spillway walls on all three faces where the hydrodemolition had removed deteriorated concrete. Rayburn Aff., ¶ 10. Rayburn stated that, throughout the project, he "measured the forms and ordered an amount of concrete consistent with the measurements I had taken." Rayburn Aff., ¶ 11. Doyle indicated the same during his deposition, but he acknowledged that Sunesis did not have the written field measurements and drawings for the patches. Sunesis prepared a spreadsheet to calculate the square footage of concrete patches using "in-place measurements . . . based off the plan sheets that were provided," not field measurements. Doyle Dep. 87-88 & Ex. D72. This calculation equaled 4,727.84 square feet. Doyle Dep., Ex. D72. McAfee equated the area of the patches to the amount that was "hydrodemoed." He testified that if he were measuring the patches, he would look at the total area that was hydrodemoed, including the two vertical aspects and the top. McAfee Dep. 61.

{¶ 41} In support of Sunesis's claim for Payment Item 31, John Denniston, former transportation manager for ODOT and a one-time employee of Sunesis, provided an affidavit about concrete patching on ODOT projects. He stated that ODOT always paid for concrete patching based on the square footage patched. Denniston Aff., ¶ 5. If

multiple faces of a concrete structure were patched pursuant to ODOT 519, ODOT paid the contract amount for the square footage of each face patched. Denniston Aff., ¶ 6-8. However, while Payment Item 31 refers to ODOT 519 in terms of the method of completing the work, the Contract does not adopt ODOT 519's method of calculating payment.

{¶ 42} In contrast to Sunesis's interpretation, MCD and DLZ viewed the patch as solely on the channel face. Steven Riedy of DLZ was the engineer of record on the Project design and was heavily involved in engineering support during the construction phase. He indicated that the engineer's estimate for Payment Item 31 was based on the square footage of the channel face only. When asked why it did not include the horizontal face, he answered, "We didn't envision patching or all of the elements that are included in that patching payment item being necessary for the tops." Riedy Dep. 51. Riedy did not believe that patching actually occurred on the horizontal face: "Patching in this instance for Item 31 involves several things, including bonding agent, doweling, wire mesh, and concrete. And those things only occurred on the channel side face. And hydrodemolition was a portion of that payment item as well." *Id.* Riedy indicated that Sheet 6 showed patching on the channel face of spillway wall and the patch extending across the entire top horizontal face of the spillway wall below the monolith cap. Riedy Dep. 62.

{¶ 43} O'Connor of MCD also interpreted the Plans as requiring one patch, to be measured from the channel face only. He emphasized that it only took one patch to replace the deteriorated concrete; "There was not a second patch and a third patch. It

was one removal process and one patch." O'Connor Dep. 59. Although deteriorated concrete was removed from the top and side, "[a]ll the hydrodemolotion was achieved by performing the work on the east [channel] face of the wall." O'Connor Dep. 63. He stated that there was no patching on the top and vertical side of the monoliths. *Id.* at 62.

{¶ 44} O'Connor's interpretation was informed by ODOT 519, which addresses payment for concrete patching on ODOT projects. O'Connor stated that, "[a]ccording to ODOT 519[,] the measurement is based on exposed face of the wall. And that's the exposed – there's only one exposed face of the wall and that's that eastern face." O'Connor Dep. 57. MCD understood the exposed face to mean the face that was exposed before or after construction, not during construction. *Id.*

{¶ 45} Kyle Sparks, DLZ's observer engineer, was on-site and completed daily inspection logs of the work performed. After the formwork was up for the concrete patching but before the concrete was poured, he measured the width and height of the formwork on channel side of spillway wall. Sparks Dep. 17-18. Sparks understood that only one patch was performed on a monolith; he was told to measure the surface, and he thought everything was included in that measurement. *Id.* at 78. Sparks explained: "It was one pour, it's surrounded on – there's bulkheads on two sides, and there's form work on the front side. It's one monolith patch in my mind." *Id.* at 78. Sparks's measurements of the channel face patches totaled 2,204 square feet. Sparks testified in his deposition that Sunesis did not do anything to confirm any of his measurements, and he did not recall seeing Sunesis performing its own measurements. *Id.* at 72.

{¶ 46} In an email exchange in late March and early April 2021, O'Connor asked

Sparks through Riedy about the hydrodemolition that IVS performed on the top and side of the monoliths. Sparks indicated that IVS would spend approximately 5 to 15 minutes "roughing up" the vertical joints and top surface of the monolith, depending on the length and height of the monolith, not accounting for the corners of the face and side where there was unsound concrete. DLZ Ex. 20; *see also* Sparks Dep. 40-41. Sparks further indicated that concrete was poured across the entire top when the original horizontal joints did not match up between adjacent monoliths; it was not due to hydrodemolition. *Id*. O'Connor had indicated, and Sparks understood, that this concrete would be accounted for with the monolith replacement. *Id*.

{¶ 47} The parties' experts also had different interpretations of the Plans. Sunesis's expert, Eric Kohls, stated that "Drawings 6, 10, and 11 of 19 and the written scope for Pay Item 31 clearly calls for the concrete removal and repairs on the vertical and horizontal surface of the monoliths." Kohls Expert Report, p. 5. He faulted MCD for "ignor[ing] the sections of the work shown on drawing 6 & 11 that clearly show the work on the horizontal surface and the direction in the field from DLZ for the work on the other face." *Id*., p. 6. Kohls also points out the MCD later altered its drawings in its documents for its subsequent project concerning the left spillway walls. *Id*.

{¶ 48} In contrast, MCD's expert, Joseph Troxell, disagreed that Sheet 6 showed patching on the top surface. He testified, "I see it extends along the horizontal construction joint, but I would interpret this to indicate that – and, again, based on the reading of the description of Pay Item 31 in the specifications, that that needs to go as deep as required in the field." Troxell Dep. 38-39. Troxell's understanding of Pay Item

31 was that patching was all measured off of the channel face. Troxell Dep. 39. He noted that all the reinforcing was on the channel face. *Id.* at 41, 45.

{¶ 49} Troxell further expressed that IVS's field measurements were not a useful measure of Pay Item 31, because it appeared that hydrodemolition was completed as part of both Pay Item 31 and Pay Item 14. Troxell Apr. 7, 2023 Report, p. 6. He stated that "[r]emoving unsound concrete on the face of the monolith is a part of work for Pay Item 31. DLZ reports describe IVS using hydro demolition to 'rough up' the surfaces against which new concrete would be cast. Demolition of those surfaces is paid for under Pay Item 14 – Portions of Structure Removed, regardless of the means of demolition." Troxell Apr. 7, 2023 Report, p. 6.

{¶ 50} MCD completed 3D scans of the spillway walls, both after demolition was completed and after repairs were done. The scans were provided to Sunesis, who retained Berding Surveying to calculate the fill area for Payment Item 31. The Berding report indicated 917.8 square feet of patching on the upstream wall and 1596.9 square feet of patching on the downstream wall, totaling 2,514 square feet. Troxell believed the scans were a useful measurement tool for Payment Item 31, although small areas of the wall were not scanned. Kohls testified, however, that he believed Berding's results were inaccurate. Kohls Dep. 98-109.

{¶ 51} Both Sunesis and MCD assert that the Contract is clear and unambiguous as to the scope of Payment Item 31. However, the record reflects that MCD and Sunesis had reasonable but differing interpretations of Sheets 6, 10, and 11 of the Plans and, consequently, of the scope of the hydrodemolition work that was required under Payment

Item 31 and how the patching would be paid. While the documents, when construed in Sunesis's favor, supported Sunesis's interpretation that the Specifications and Plans showed patching on three faces, General Condition 8 squarely placed in the hands of the Engineer the authority to resolve questions regarding interpretation of the Specifications and Plans. Moreover, where the Contract documents conflicted, the Engineer's resolution of the inconsistency governed. GC-35.

{¶ 52} Sunesis argues that General Condition 8 related only to directing the manner of work and not payment. However, the two issues are not easily separated, as both parties rely heavily on the Specifications and Plans to support their positions. The trial court did not err in concluding as a matter of law that, under the terms of the Contract, the Engineer had the authority to resolve the dispute about what constituted a patch under Payment Item 31 and, consequently, what face(s) were appropriately measured for payment.

{¶ 53} The Engineer interpreted the Specifications and Plans as illustrating a single patch to be measured from the channel face of the spillway walls. MCD paid Sunesis based on the field measurements taken primarily by Sparks of the patching on the channel face. Sunesis did not dispute the accuracy of those measurements. Accordingly, the trial court did not err in determining that Sunesis was not entitled to additional payment under Payment Item 31.

{¶ 54} Even if Sunesis were entitled to payment for the areas on top and side of the monoliths where hydrodemolition occurred, there is no evidence that Sunesis provided "field measurements" for Payment Item 31 to the Engineer prior to its requests

for payment, as required by Subsection 31.5. Although Sunesis employees indicated that they took measurements – length, height, and depth – to order concrete, Sunesis did not provide its own field measurements for the patching to MCD. *E.g.*, Doyle Dep. 68; Riedy Dep. 134. Sunesis relies instead on IVS's hydrodemolition invoices, arguing that they were sufficient to constitute "field measurements of the patched areas repaired." However, the invoices contained the square footage calculated from IVS's apparent measurements, but not the measurements themselves. Most of the invoices did not distinguish between square footage of the front, side, and top of the monoliths, and none identified the monoliths that were hydro-demolished. Under the plain language of Subsection 31.5, Sunesis did not demonstrate that it provided field measurements to MCD.

{¶ 55} Finally, we note that genuine issues of material fact would have precluded summary judgment in Sunesis's favor even accepting Sunesis's interpretation of the Plans and assuming that the invoices were sufficient to establish the field measurements. Although the IVS invoices provided the square footage of the hydrodemolition that occurred, MCD presented evidence that the invoices included hydrodemolition that was not associated with Payment Item 31.

{¶ 56} The trial court properly denied Sunesis's motion for partial summary judgment on Payment Item 31 and granted summary judgment to MCD on Payment Item 31. Accordingly, the first assignment of error is overruled.

**B. Payment Items 11, 20, and 26**

{¶ 57} In its second assignment of error, Sunesis claims that the trial court erred

in granting summary judgment to MCD on Sunesis's claims regarding Payment Items 11, 20, and 26. Those Payment Items concerned different aspects of the Project, but they contained similar measurement and payment provisions.

{¶ 58} Payment Item 11 covered the construction of a concrete apron behind the spillway walls. It included "erecting and removing concrete forms; supplying, placing, and finishing concrete; and supplying and placing reinforced steel as shown on the Plans." Payment Item 11.1. The measurement and payment provision stated, "Measurement for Concrete Apron shall be based on the number of cubic yards of concrete in the concrete aprons behind the spillway walls based on the locations shown on the Plans." Payment Item 11.5.

{¶ 59} Payment Item 20, entitled Concrete, concerned the construction of reinforced concrete monoliths at the tops of the spillway walls to replace the existing concrete structures that were being removed. Measurement for Concrete was to be based on "the number of cubic yards of concrete in the entire monoliths that are replaced at the tops of the spillway walls based on the locations shown on the Plans." Payment Item. 20.5.

{¶ 60} Payment Item 26 concerned the construction of a concrete revetment behind the spillway walls. Subpart 26.5 provided that "[m]easurement for Concrete Revetment shall be based on the number of cubic yards of concrete placed as measured by the computed volume based on the location shown on the Plans."

{¶ 61} For each of these Payment Items, payment was to be made at the Contract unit price per cubic yard for the Payment Item. Payment Items 11.5, 20.5, and 26.5.

{¶ 62} On appeal, Sunesis contends that nothing in the Contract specified that the payments for Payment Items 11, 20, and 26 must be based on field measurements. It argues that it could rely on concrete delivery tickets and invoices provided by its supplier, Spring Creek, for each Payment Item. Sunesis asserts that MCD itself proposed the use of concrete delivery tickets to calculate the amount of concrete that was placed. Sunesis thus claims that genuine issues of material fact exist as to the total cubic yards placed for Payment Items 11, 20, and 26.

{¶ 63} Beginning with the contract language, we agree with Sunesis that the language in Subsections 11.5, 20.5, and 26.5 did not specify that the payment for the volume of concrete had to be based on field measurements. Unlike Subsections 9.5 (concrete headwall), 19.5 (dowel holes), and 31.5 (concrete patching), all of which linked payment to measurements in the field, the measurement and payment provisions for the apron, concrete, and revetment did not specifically require field measurements. And while the disputed subsections did not specifically authorize payment based on concrete tickets and/or invoices, neither did they indicate a specific method by which Sunesis was to substantiate the amount of concrete it used to perform those tasks.

{¶ 64} MCD further emphasized in the trial court that Sunesis submitted 16 pay applications but did not provide any of the concrete tickets and invoices during that process. It argued that Sunesis was asserting an "alternative payment process" which, if successful, would render the Contract Documents and related payment process worthless. We disagree here, too.

{¶ 65} Nothing in the Contract required Sunesis to submit supporting

documentation for Payment Items 11, 20, and 26 as part of its payment applications. *See* GC-16 (partial payments). Rather, General Condition 16 instructed Sunesis to provide the payment item number, description, contract unit price, quantity of work completed for that time period, dollar amount of work completed, and dollar amount of all payment items included. The pay application also had to include the project name, MCD contract number, application number, application date, and period of work to date completed. Unlike Payment Item 31, which required Sunesis to provide field measurements for verification prior to payment, no similar language was included in Subsections 11.5, 20.5, and 26.5.

{¶ 66} In addition, General Condition 16 stated that monthly payments were approximates only, and all partial estimates and payments were subject to correction in the final estimate and payment. Under General Condition 17, final submittals were due 60 days after MCD accepted the Project by a "Report of Final Inspection." It is unclear whether that has occurred.

{¶ 67} We therefore turn to whether genuine issues of material fact exist as to the amount that Sunesis was entitled to receive for Payment Items 11, 20, and 26.

{¶ 68} In support of its motion for summary judgment, MCD presented evidence that it paid Sunesis in full for Payment Items 11, 20, and 26 based on field measurements and the agreed upon amounts in the change orders. MCD and DLZ interpreted the payment items as providing for payment based on concrete actually placed, and Sparks of DLZ took measurements in the field regarding each of the payment items. *See generally* Sparks Dep.; Riedy Dep. 131-133. For the concrete apron, Sparks used a

construction wheel to measure the surface area and calculated the volume using the depth shown on the Plans.    Sparks Dep. 21-22.

{¶ 69} Regarding Payment Item 20, Sparks testified that he measured the new monoliths by getting inside the form work and measuring "at all of the corners at the bottom side, both sides, and the top corners, and anywhere where it wasn't a straight line, where it would deviate, to try to break it up, monoliths into two different sections if I had to."    Sparks Dep. 17,

{¶ 70} Steven Riedy, DLZ's project manager for the Project, communicated with O'Connor on April 30, 2020, about the quantity of concrete that was used for Payment Item 20.    Riedy explained that two things were constructed differently than the Plans with authorization from MCD: Monolith 1 was replaced with a thicker section than shown on the Plans, and Monolith 22A was replaced rather than patched.    As a result, the concrete volume for Payment Item 20 was revised to 704 cubic yards.    Later, additional work was performed because two other monoliths were found to be broken and field locations of joints were found to be different from the Plans.    Payment for the additional work on the monolith replacement was included in Change Orders #1 and #2.

{¶ 71} With the revetment, Sparks stated that he used a measuring wheel and measured the surface area, then multiplied the surface area by the agreed depth, and separately accounted for the area with a greater depth.    Sparks Dep. 18.    O'Connor recalled two discussions about concrete overages related to the revetments.    He testified during his deposition that the design for the upstream revetment had been changed, at Sunesis's request, so that it could be built more easily.    O'Connor Dep. 53-54.    As a

result, there was a larger area for that portion of the revetment on the upstream end, but it reduced the thickness of the concrete and the amount of reinforcement steel on the concrete. *Id.* at 54.

**{¶ 72}** Robert Doyle, Vice President of Operations for Sunesis, agreed that the Contract required "in place" quantities for payment. *E.g.*, Doyle Dep. 30. He testified that the Sunesis foreman took field measurements for Payment Items 11, 20, and 26, but those measurements were not retained, and no written drawings or measurements could be provided to MCD. Doyle Dep. 32-34, 40-41; *see also* McAfee Dep. 59-60. Neither Riedy nor Sparks was aware of any measurements provided by Sunesis. Riedy Dep. 131-133; Sparks Dep. 72-75. Doyle further noted that field measurements for the monoliths (Payment Item 20) would be difficult to obtain. Doyle Dep. 37.

**{¶ 73}** According to Sunesis's expert, Kohls, however, one method of measuring material used is calculating how much material was ordered and put into place. Kohls Dep. 32. Doyle similarly testified that in-place concrete quantities could be demonstrated with the amount that was delivered per the concrete tickets. Doyle Dep. at 31. Rayburn, a foreman for Sunesis, substantiated that he and his team "measured the area after the form work was placed for each area of the Project, including width, height, and depth, if necessary, and ordered an amount of concrete consistent with the measurements we had taken, in cubic yards." Rayburn Aff., ¶ 5; *see also* Doyle Dep. 32-33. Doyle indicated that the order also included a five percent waste "because we don't want a cold joint. We don't want to take a chance of losing the pure." Doyle Dep. 58. Kohls indicated that five percent was a reasonable waste factor for the type of work

that Sunesis was performing.  Kohls Dep. 30.

{¶ 74} Sunesis received field tickets from its concrete supplier, Spring Creek, detailing the amount of concrete Spring Creek delivered in each truck, in cubic yards. Rayburn Aff., ¶ 7.  The field tickets were also included in weekly invoices that Sunesis received from Spring Creek.  *Id.* at ¶ 8.  Copies of the tickets and invoices were attached to Rayburn's affidavit.

{¶ 75} Sunesis's requests for payment for Payment Items 11, 20, and 26 were based on the concrete tickets, minus five percent for waste.  Doyle Dep. 55-56.  Using that method, Sunesis originally calculated that it was owed for 15.25 cubic yards of concrete for Payment Item 11, 62.29 cubic yards for Payment Item 20, and 85.53 cubic yards for Payment Item 26.  Doyle Dep. 122.  Under Change Order #2, MCD compensated Sunesis for an additional 4 cubic yards for Payment Item 11 and 24 cubic yards for Payment Item 20.  Sunesis has thus presented evidence that it is now owed for (1) 11.25 cubic yards for Payment Item 11 at a unit cost of $546, for a total of $6,142.50, (2) 38.29 cubic yards for Payment Item 20 at a unit cost of $1,058.75, for a total of $40,539.54, and (3) 85.53 cubic yards for Payment Item 26 at a unit cost of $706, for a total of $60,384.18.  *See* Kohls Ex. Report, Summary of Damages.

{¶ 76} The record contains evidence from which a factfinder could conclude that the concrete tickets, minus a five percent waste factor, were not an accurate measurement of the concrete actually placed for Payment Items 11, 20, and 26. O'Connor explained that concrete tickets "are created by the concrete company at their plant and us, as project owners, don't have control over how much concrete is put into

the truck, how much concrete leaves the site in the truck, so there's too much uncertainty with tickets to use them as a reliable source of figuring quantities." O'Connor Dep. 139-140.

{¶ 77} Sparks also testified in his deposition that there was an unusual amount of concrete waste on the Project. Sparks Dep. 27. He recalled a conversation with Dave Koontz, the foreman for the upstream wall portion, in which Koontz indicated that he would order a minimum of three cubic yards, even if less were needed, because Sunesis only got paid for what was placed and there were fees for having less than three cubic yards of concrete. *Id.* at 27-28.

{¶ 78} In a March 2021 email to McAfee, O'Connor challenged Sunesis's use of a five percent waste factor. O'Connor indicated that he had taken a "random sampling of concrete items poured and checked the concrete truck tickets and field measurements for each pour." O'Connor Dep. 141-142 & Ex. 29. After sampling ten total pours from concrete monoliths, concrete aprons, and concrete revetment, he found that the average concrete waste was 18.6 percent, the lowest waste of those ten was 2.6 percent, and the highest was 28.2 percent." *Id.* He surmised that "[t]his could be a combination of ordering too much and/or placing too much depth on things like aprons and revetment," but reiterated that the "concrete tickets are not sufficient evidence for me to pay for more quantity than was designed or measured in the field."

{¶ 79} MCD's evidence raises questions about the validity of Sunesis's use of the volume reflected on Spring Creek's concrete tickets and invoices and of a five percent waste factor. However, it is the role of a factfinder to determine the credibility of the

parties' evidence on the compensable amount of concrete, not the role of the court upon a motion for summary judgment. (We note that the parties have agreed to the trial judge's serving as the trier of fact in this case. *See* Agreed Entry Transferring Case, June 13, 2022.). We thus conclude that the trial court erred in granting summary judgment to MCD on Sunesis's claims on Payment Items 11, 20, and 26, and that the matter must be remanded for further proceedings on these payment items.

{¶ 80} Sunesis's second assignment of error is sustained.

### V. MCD Counterclaim

{¶ 81} In its third assignment of error, Sunesis claims that the trial court erred in granting summary judgment to MCD on MCD's counterclaim for construction delay damages. It argues that MCD delayed the Project's completion by substantially changing the plans and specifications and that, under *United States v. Spearin*, 248 U.S. 132 (1918), it should not be liable for the delays.

{¶ 82} According to the Contract, Sunesis was required to complete the Project within 180 calendar days, unless the period for completion was changed by written Change Order. General Condition-11 gave MCD the right to withhold amounts if the Project were not completed timely. It read, in part:

> It is mutually agreed by and between the parties hereto that time is an
> essential part of this Contract, and if the CONTRACTOR shall fail to carry
> on the work with such force and in such manner and order, and at such
> points, within the time set out in its Proposal, . . . MCD may retain from the
> monies that are due, or which may become due said CONTRACTOR,

MCD's estimated daily cost of the completed work, for each and every calendar day the completion of the work be delayed beyond the time specified herein for such completion; or such extensions thereto as may be approved in writing by MCD upon written request from the CONTRACTOR. The CONTRACTOR shall not be entitled to a bonus for early completion. CONTRACTOR acknowledges that time is of the essence. By this it is meant that the maintenance of construction schedules is critical to the success of the Project. Accordingly, CONTRACTOR hereby agrees that if its performance hereunder is not completed within the time provided for completion, it shall reimburse and indemnify MCD for and against any and all loss and expense of any and every kind, whether direct or consequential, including reasonable attorney fees.

GC-11.

**{¶ 83}** General Condition-15 expressly addressed extensions of time. It provided: Delays due to causes beyond the control of the CONTRACTOR, other than such as reasonably would be expected to occur, may entitle the CONTRACTOR to an extension of time; however, the CONTRACTOR declares that it has familiarized itself with weather and local conditions and other circumstances which may, or are likely to, affect the performance and completion of the work, and agrees that it will prosecute the work in such manner that it will be completed without undue delay, even though the most adverse conditions which reasonably could be expected to occur do prevail

during the performance of the work.

. . .

No extension of time shall be granted for any cause, unless the CONTRACTOR shall within 15 days from the initiation of the delay, notify the ENGINEER in writing of such delay, and of its cause and time of beginning, and the CONTRACTOR's assessment of the extent of the delay, and the ENGINEER will make an independent assessment. If the ENGINEER agrees to grant a time extension, MCD will issue a Change Order amending the Contract completion date.

The CONTRACTOR shall pay or, to have deducted from the Contract price, the actual amount of the inspection and Contract administration costs for each day past the final completion date in the Contract, plus additional days agreed to for approved Change Orders. The cost for the inspection and Contract administration services will be based on invoices paid by MCD for such services.

{¶ 84} The parties agree that the initial completion date was April 11, 2020. The parties further agree that the construction delays occurred, although they differ as to the causes of the delays and their effect on the completion date.

{¶ 85} O'Connor of MCD stated in his deposition that Sunesis did not get started right away and it had issues determining how to start the Project, such as how to access the wall. O'Connor Dep. 34. O'Connor also attributed Sunesis's delays to a lack of crew and equipment. He explained, "It seemed like there were times when they could

have had more people and more equipment on site to finish things quicker. And then toward the end of the project especially there [were] long periods where they were not on site at all and they would come back periodically. They didn't work consistently through to completion." O'Connor Dep. 36.

{¶ 86} Riedy of DLZ agreed that the project took longer than anticipated. Riedy Dep. 36. He also testified that Sunesis "didn't appear to show up with a plan to execute the work" and "[i]t appeared they were trying to figure out how to best approach the work once they got on-site." Riedy Dep. at 36.

{¶ 87} Throughout the Project, the parties communicated by email. In addition, regular progress meetings were held with representatives from MCD, Sunesis, DLZ, and the Ohio Department of Natural Resources (ODNR). *See* O'Connor Dep., Ex. 16. Early in the Project, it became clear that the location of the major vertical joints in the wall deviated from those depicted on the construction documents. On November 13, 2019, demolition was delayed due to this discrepancy, and McAfee, project manager for Sunesis, provided written notice to MCD that it was tracking the loss of productivity due to this issue. McAfee Dep., Ex. D93; Sparks Dep. 37. On November 14, 2019, Riedy of DLZ provided O'Connor a Revised Sheet 10 depicting concrete monolith removal limits. He also informed O'Connor of the consequent increased quantities for Payment Items 14, 20, and 31. Riedy Dep., Ex. 5 & 6. Design Sheet 11 also needed to be revised. In January 2020, Sunesis reported some delays due to high water; the access road was under water and water had to be pumped out.

{¶ 88} O'Connor's notes from the February 5, 2020 progress meeting indicated

that, at that point, the parties anticipated a July completion date. At the meeting, Sunesis shared its reasons for the delays, including (1) an early learning curve related to the means and methods because of the unique nature of this project; (2) Sunesis was not comfortable with the bridge bracket approach to access the front of the spillway wall; (3) the upstream section of the wall needed more concrete depth removed by hydrodemolition than expected; (4) high water events affected lift access and access to the lower sections of the wall; (5) additional monolith removal and replacement at the bottom of the wall required continuous pumping, more excavation, and was affected by even minor rises in the creek level; (6) the sheet 10 redesign delayed the start of concrete work; (7) multiple reinforcing steel redesigns; (8) temperatures were too cold for hydrodemolition at times; (9) a change in hydrodemolition methods (to using a wand), which takes longer; (10) some rain days led to mud and access issues; and (11) the hydrodemolition sounding process. O'Connor Dep., Ex. 20. MCD asked Sunesis to attempt to assign days of delay for the reasons they provided. *Id.*

{¶ 89} On February 24, 2020, McAfee sent a letter to O'Connor itemizing the delays and calculating 79 days of delay due to those factors. O'Connor Dep. Ex. 22. Sunesis' estimated completion date was July 30, 2020. *Id.* O'Connor and Riedy agreed that some of Sunesis's reasons for delay were valid, but they did not agree with all of them. O'Connor Dep. 120; Riedy Dep. 93-97.

{¶ 90} On June 16, 2020, the parties approved Change Order #1, dated June 10, 2020. *See* Sunesis's Opposition to MSJ on MCD's Counterclaim, Ex. 1; Kohls Dep., Ex. 2. Under this change order, Plan Sheets 10 and 11 were replaced with Plan Sheets 10R

and 11R, the contract completion date was extended by 110 days, and Sunesis was compensated for additional concrete sawing and for changes to the cofferdam and continuous dewatering for Monoliths 1B and 1C. Change Order #1 explained that the contract date was extended by 110 days "due to low winter temperatures, high water events, and changes to the work." The completion date for all work was revised to July 30, 2020. Change Order #1 granted an extension of time for whatever the excusable delays were at that time. O'Connor Dep. 122.

{¶ 91} Sunesis states that it performed additional work at MCD's request after Change Order #1. According to Sparks's daily inspection log, on August 26, 2020, Sunesis graded the flat area above the creek slopes at and upstream of the northwest concrete revetment per MCD's request from MCD's last on-site visit. Sunesis's Opposition to MSJ on MCD's Counterclaim, Ex. 2. On August 28, 2020, Sunesis installed an additional keyway on Monolith 48. Id., Ex. 3. The daily inspection log for August 28 reflects that this work took approximately 120 minutes to complete. *Id.*

{¶ 92} In December 2021, after Sunesis had substantially completed its work and after litigation had begun, the parties agreed to a second change order. *See, e.g.,* Doyle Dep., Ex. D-76; Kohls Dep., Ex. 3. Change Order #2 approved additional payment for the concrete apron, rocket channel protection, concrete, and fencing. It also included payment for removal of draft at the upstream end of the dam conduits, installation of some reinforcing steel, installation of dowels on some small monoliths, installation of a concrete walk, and fabrication and installation of an aluminum staff board on the upstream right wall. The Contract price increased by $54,162. Nothing was written in the area where

the parties would indicate how much the Contract Time would change. Change Order #2 again indicated that the date of completion for all work would be July 30, 2020. Sunesis's corporate secretary signed Change Order #2 on March 5, 2022; O'Connor signed Change Order #2 for MCD on March 8, 2022, and MCD's general manager signed it the next day.

{¶ 93} In his deposition, Doyle admitted that Change Order #2 did not include a revised completion date. He nevertheless testified, "It is to be assumed that if you do additional quantities of work, it should be implied that there's additional time to complete those additional quantities." Doyle Dep. 52. O'Connor stated that MCD intentionally kept the July 30, 2020 completion date as part of Change Order #2 even when the completion date had already passed. O'Connor Aff., ¶ 25.

{¶ 94} Sunesis's expert, Eric Kohls, also opined in his report and testified in his deposition that MCD did not substantiate its counterclaim for delay. Kohls Ex. 1. He expressed that MCD had agreed to a time extension of 110 days in Change Order #1, and the "remaining 93 days in its claim should be an excused delay to Sunesis for the Project due to the issues, including but not limited to the following:

1. Additional work agreed to in CO #2.

2. Additional work for the disputed quantities increases in Sunesis's Claim . . .

3. Unforeseen conditions associated with the monolith 1B and 1C due to cracking below grade. To correct this issue, our cofferdam had to be modified and additional dewatering was required.

4. The vertical joints between the monoliths were not in accordance with the plan

documents. MCD ordered Sunesis to stop hydro-demolition activities until the joints could be mapped and a revised plan be developed."

Kohls Ex. 1, p. 7. Kohls believed that Change Order #2 was irrelevant in terms of the delay issue. Kohls Dep. 52.

{¶ 95} When construing the evidence in the light most favorable to Sunesis, no genuine issue of material fact exists that Sunesis failed to complete the Project by the July 30, 2020 deadline. Sunesis's own evidence unequivocally demonstrated that Sunesis had not completed the Project by July 30, 2020. Exhibit 2 to Sunesis's memorandum in opposition to MCD's motion for summary judgment on the counterclaim showed not only the additional work that MCD asked it to do, but also that Sunesis performed work due to damage that it had caused to piezometer main trunkline conduit and other work required by the Contract. Sunesis's Exhibit 3 to its opposition memorandum similarly showed that Sunesis was continuing to perform tasks required by the Contract. Moreover, other daily inspection logs from July 30, 2020, and later substantiated that a significant amount of work remained to be done on the Project after July 30, 2020. O'Connor Dep., Ex. 15.

{¶ 96} Sunesis argues on appeal, as it did in the trial court, that MCD delayed the Project's completion by substantially changing the plans and specifications and that the *Spearin* Doctrine thus applies. Sunesis also asserts that much of the additional scope of work for the Project was caused by the inaccurate bid quantities provided by MCD, which could not have been discovered through any pre-bid inspection.

{¶ 97} In *Spearin*, the United State Supreme Court recognized that when a

contractor is "bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Spearin*, 248 U.S. at 136. However, the Ohio Supreme Court has declined to extend the *Spearin* doctrine to disputes about construction delays. *See Dugan & Meyers Constr. Co.*, 2007-Ohio-1687. Moreover, it has held that the *Spearin* Doctrine does not invalidate an express contractual provision. *S & M Constructors, Inc. v. Columbus*, 70 Ohio St.2d 69, 75 (1982).

{¶ 98} The Ohio Supreme Court addressed the *Spearin* Doctrine in *Dugan & Meyers. Dugan & Meyers* involved claims arising from a contractor's failure to complete construction of three buildings on the Ohio State University campus within the 660 days required by the contract. The State removed the lead contractor due to the delays and had the completion overseen by another contractor. When the original contractor sought payment under the contract, the State deducted the amount paid to the second lead contractor and also assessed liquidated damages for the delay, as permitted by the contract. The original lead contractor sued for breach of contract and unjust enrichment, claiming that the delay was due to deficiencies in the plans provided by the State, delays caused by the State, and additional work outside the contract that it had been required to complete. The State counterclaimed for delay damages.

{¶ 99} The Ohio Supreme Court distinguished *Spearin*, stating that *Spearin* involved the existence of a site condition that precluded completion of the construction project whereas the case before it concerned the allocation of damages flowing from delay in completion of a construction project due to plan changes. The Court declined

to extend the *Spearin* Doctrine from job-site-conditions cases to cases involving delay due to plan changes. (Citations omitted.) *Dugan & Meyers* at ¶ 27-28. The supreme court emphasized that the OSU construction contract had included terms that addressed the contractor's remedy when changes were made to the plans.

{¶ 100} The *Spearin* Doctrine does not apply here. Completion of the Project was not precluded by conditions at the Lockington Dam, and MCD's Plans and Specifications were not so defective that Sunesis could not successfully complete the Project. Rather, as with *Dugan & Meyers*, this matter concerns delays resulting, in part, from changes to the Plans and Specifications.

{¶ 101} In its responses to MCD's first set of interrogatories (Ex. D-59), Sunesis identified several reasons for why it did not complete the Project by April 11, 2020, and again by July 30, 2020. *See* Answers to Interrogatories 6 & 7. Sunesis's expert, Eric Kohls, also cited four reasons why Sunesis's failure to complete the Project by the completion date was excused. Many of the circumstances that Kohls and Sunesis pointed to occurred prior to Change Order #1. These included unforeseen conditions associated with Monolith 1B and 1C, inaccuracies in the Plan documents regarding the vertical joints, abnormally cold winter temperatures, flood events, and additional quantities performed on contract items. Through Change Order #1, the parties agreed to extend the completion date from April 2020 to July 30, 2020. It expressly stated that the extension was due to "low winter temperatures, high water events, and changes to the work." As a matter of law, Sunesis cannot rely on events prior to Change Order #1 to support an equitable extension of the July 30, 2020 completion date.

{¶ 102} It is undisputed that, after July 30, 2020, MCD asked Sunesis to perform tasks that were not included in the Contract. Sunesis stated in its interrogatory responses that the additional work included drift removal, additional reinforcement and design changes in the poured revetment, additional vertical dowels on the monoliths, the addition of a 4" concrete walk, and the addition of an aluminum staff board. Rayburn also detailed additional work concerning Monolith 51A, the concrete apron, and other specific projects. Rayburn Aff., ¶ 10-15 and Exs. B & C. Sunesis has not detailed how much delay was associated with these additional items. Sunesis also attached two daily inspection logs to its memorandum in opposition to summary judgment on MCD's counterclaim, which showed that the two items were performed in August 2020; the logs show that those items took minimal time to complete.

{¶ 103} MCD cites to *Foster Wheeler Enviresponse*, 78 Ohio St.3d 353 (1997), to support its assertion that Sunesis was required to obtain a written change order to alter the completion date of the Project. In that case, a hazardous waste remediation contractor agreed to excavate and transport 140 cubic yards of contaminated material from the construction site of the Greater Columbus Convention Center. After more contaminated material was found, the contractor sought compensation for its removal of the additional material. Summary judgment was granted to the public agency and its environmental consulting firm, and the contractor appealed. The Tenth District reversed as to the public agency, concluding that written authorization was required only for a change in the scope of work.

{¶ 104} On review, the Ohio Supreme Court reinstated the grant of summary

judgment to the public agency. Initially, it noted that "[i]t is universally recognized that where a building or construction contract, public or private, stipulates that additional, altered, or extra work must be ordered in writing, the stipulation is valid and binding upon the parties, and no recovery can be had for such work without a written directive therefor in compliance with the terms of the contract, unless waived by the owner or employer." *Id.* at 360. It further stated that "in the absence of express authority, an engineer, architect, superintendent or inspector in charge of or assigned to public building or construction work has no power to waive or modify a stipulation requiring a written order for alterations, even where that person may authorize alterations in writing." *Id.* at 364.

{¶ 105} After applying well established canons for the interpretation of contracts, the supreme court concluded that the contract required a change order for the change in quantity. It commented that the "primary purpose of requiring written authorization for alterations in a building or construction contract is to protect the owner against unjust and exorbitant claims for compensation for extra work. It is generally regarded as one of the most effective methods of protection because such clauses limit the source and means of introducing additional work into the project at hand. It allows the owner to investigate the validity of a claim when evidence is still available and to consider early on alternative methods of construction that may prove to be more economically viable. It protects against runaway projects and is, in the final analysis, a necessary adjunct to fiscal planning." *Id.* at 363-64.

{¶ 106} We agree with MCD that Sunesis was bound by the contractual provisions regarding change orders, delays, and extensions of time. For Sunesis to be

compensated for the additional work that it was asked to perform, the parties needed to agree to a change order encompassing that work.   And, to the extent that the additional work would affect the existing completion date, the parties should have negotiated a modified completion date as part of the change order.

{¶ 107} As to other reasons for delay, the Contract required Sunesis to provide written notice of delays.   Specifically, General Condition 15 required Sunesis to notify the Engineer in writing within 14 days from the initiation of a delay of (1) the cause of the delay, (2) when it began, and (3) the contractor's assessment of the extent of the delay. Sunesis did not provide MCD written notice of any delay occurring after July 30, 2020, nor did it seek an extension of time in writing.   Accordingly, as a matter of law, Sunesis was not entitled to an extension of time beyond July 30, 2020.

{¶ 108} The third assignment of error is overruled.


## VI. Conclusion

{¶ 109} The trial court's judgment will be affirmed in part, reversed in part, and remanded for further proceedings on Payment Items 11, 20, and 26.

. . . . . . . . . . . . .


WELBAUM, J. and LEWIS, J., concur.